**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DENNIS LARKIN and DANIELLE GOSLINE, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>CAREMARK RX, L.L.C. (d/b/a CVS CAREMARK),<br><br>       Defendant. | Case No. 1:25-cv-07307<br><br><br>Oral Argument Requested |

## <u>DEFENDANT CAREMARK RX, L.L.C.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

    I.    Caremark provides pharmacy benefit management services. ............................... 2

    II.    Plaintiffs agreed to mandatory arbitration with Caremark. ................................. 3

    III.    Plaintiffs brought putative class action claims against Defendant in federal court. ........... 8

PROCEDURAL BACKGROUND ....................................................................................... 8

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ...................................................................................................................... 11

    I.    Plaintiffs voluntarily agreed to arbitrate their claims against Defendant. ........ 11

    II.    The arbitration agreement covers this dispute. ................................................... 15

        A.    The broad scope of the arbitration agreement is enforceable. ..................... 15

        B.    Plaintiffs' claims fall within the scope of the broad arbitration agreement. ................. 16

            1.    The arbitration agreement covers disputes with Defendant. .................... 16

            2.    The arbitration agreement encompasses the dispute alleged in the Complaint. ....... 17

    III.    The effective-vindication doctrine does not apply to Plaintiffs' claims. .......... 19

    IV.    This Court should compel arbitration and stay the case without deciding the motion to dismiss ............ 23

    V.    Discovery should be stayed pending a ruling on this motion. .......................... 24

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahmad v. Day*,
  No. 20 Civ. 4507, 2021 U.S. Dist. LEXIS 32401 (S.D.N.Y. Feb. 22, 2021) .........................27

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)..................................................................................................................10

*Avant Petroleum, Inc. v. Pecten Arabian, Ltd.*,
  696 F. Supp. 42 (S.D.N.Y. 1988) ............................................................................................11

*Burch v. 1412 Lansdowne Operating, LLC*,
  No. 18-CV-3000, 2020 WL 1243805 (E.D.N.Y. Sep. 29, 2021) .............................................26

*Canouse v. Protext Mobility, Inc.*,
  No. 18 Civ 3610, 2019 U.S. Dist. LEXIS 20195 (S.D.N.Y. Jan. 30, 2019)............................11

*Cedeno v. Sasson*,
  100 F.4th 386 (2d Cir. 2024) .............................................................................................21, 24

*Coe v. Coca-Cola Co.*,
  702 F. Supp. 3d 140 (W.D.N.Y. 2023) ...................................................................................14

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
  990 F.3d 173 (2d Cir. 2021)........................................................................................21, 24, 25

*Davitashvili v. Grubhub Inc.*,
  131 F.4th 109 (2d Cir. 2025) .........................................................................................2, 12, 13

*Dean Witter Reynolds Inc. v. Byrd*,
  470 U.S. 213 (1985)............................................................................................................10, 25

*Desarrolladora La Ribera v. Anderson*,
  No. 24-CV-67, 2024 U.S. Dist. LEXIS 231048 (S.D.N.Y. Dec. 20, 2024) ...........................26

*Durso Supermarkets v. D'Urso (In re Durso Supermarkets)*,
  170 B.R. 211 (S.D.N.Y. 1994)................................................................................................11

*Edmundson v. Klarna, Inc.*,
  85 F.4th 695 (2d Cir. 2023) ................................................................................................2, 12

*Feld v. Postmates, Inc.*,
  442 F. Supp. 3d 825 (S.D.N.Y. 2020)....................................................................................14

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995)................................................................................................................11

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010)........................................................................................................15, 16

*Gupta v. Merrill Lynch*,
    No. 12-1787, 2014 U.S. Dist. LEXIS 113670 (E.D. La. Aug. 15, 2014) .........................16, 18

*Himber v. Live Nation Worldwide, Inc.*,
    No. 16-CV-5001, 2018 U.S. Dist. LEXIS 84945 (E.D.N.Y. May 21, 2018) ....................14, 21

*In re Motors Liquidation Co.*,
    943 F.3d 125 (2d Cir. 2019)...................................................................................................16

*In re NAP, Inc.*,
    No. 96 Civ. 640, 1996 U.S. Dist. LEXIS 5857 (S.D.N.Y. Apr. 30, 1996)..............................11

*Iowa Ass'n of Bus. & Indus. v. Ommen*,
    No. 4:25cv211, 799 F. Supp. 3d 795 (S.D. Iowa 2025)............................................................2

*Jabbour v. Brillio, LLC*,
    No. 24-cv-2704, 2025 U.S. Dist. LEXIS 47330 (S.D.N.Y. Mar. 14, 2025)............................18

*Kelly-Starkebaum v. Papaya Gaming Ltd.*,
    No. 24cv2310, 2024 U.S. Dist. LEXIS 229875 (S.D.N.Y. Dec. 17, 2024)..............................14

*KPMG LLP v. Cocchi*,
    565 U.S. 18 (2011)................................................................................................................10

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)...................................................................................................17

*Lee v. Ticketmaster L.L.C.*,
    817 F. App'x 393 (9th Cir. 2020) ..........................................................................................13

*Lewis v. ANSYS, Inc.*,
    No. 19-CV-10427, 2021 U.S. Dist. LEXIS 60898 (S.D.N.Y. Mar. 30, 2021) .......................26

*Local Union 97, IBEW v. Niagara Mohawk Power Corp.*,
    67 F.4th 107 (2d Cir. 2023) .............................................................................................15, 16

*Maffea v. Ippolito*,
    247 A.D.2d 366 (2d Dep't 1998)...........................................................................................12

*Marsh v. Williams*,
    No. 22 Civ. 8920, 2023 U.S. Dist. LEXIS 34161 (S.D.N.Y. Feb. 27, 2023) .........................27

*Mass. Mut. Life Ins. v. Russell*,
    473 U.S. 134 (1985)..............................................................................................................22

*Meisels v. Uhr*,
  79 N.Y.2d 526 (1992) ..................................................................................................16

*Merrick v. UnitedHealth Grp. Inc.*,
  127 F. Supp. 3d 138 (S.D.N.Y. 2015)..........................................................................20

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017)...............................................................................2, 13, 14

*New York v. Oneida Indian Nation*,
  90 F.3d 58 (2d Cir. 1996)............................................................................................16

*Patrick v. Focus Fin. Partners, LLC*,
  No. 25cv5053, 2025 U.S. Dist. LEXIS 162001 (S.D.N.Y. Aug. 19, 2025) ......................15, 16

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
  18 F.4th 956 (8th Cir. 2021) .........................................................................................2

*Platt v. Sodexo, S.A.*,
  148 F.4th 709 (9th Cir. 2025) ...............................................................................21, 25

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004).................................................................................12, 14

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999)....................................................................................................26

*Silver v. Nissan-Infiniti LT, LLC*,
  724 F. Supp. 3d 217 (S.D.N.Y. 2024)..........................................................................21

*Smith v. Experian Info. Sols., Inc.*,
  No. 1:22-cv-06960-VSB, 2023 U.S. Dist. LEXIS 112052 (S.D.N.Y. June 6, 2023)..............27

*Smith v. Spizzirri*,
  601 U.S. 472 (2024).....................................................................................................25

*Staehr v. Hartford Fin. Serv's Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008).........................................................................................17

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019).........................................................................................12

*Trs. of Laundry, Dry Cleaning Workers & Allied Indus. Health Fund, Workers United v. FDR Servs. Corp. of N.Y.*,
  No. 17 CV 7145 (VB), 2019 U.S. Dist. LEXIS 146869 (S.D.N.Y. Aug. 28, 2019) .........26, 27

*Williams v. Shapiro*,
  161 F.4th 1313 (11th Cir. 2025) ..................................................................................25

**RULES**

Fed. R. Civ. P. 26(c) ....................................................................................................27

**STATUTES**

9 U.S.C. § 2.................................................................................................................10

9 U.S.C. § 3.................................................................................................................25

9 U.S.C. § 4.................................................................................................................10

29 U.S.C. § 1109...........................................................................................................9

29 U.S.C. § 1109(a) ................................................................................................22, 23

29 U.S.C. § 1132(a)(2).............................................................................................9, 22

**OTHER AUTHORITIES**

*Affiliate*, Black's Law Dictionary (12th ed. 2024).........................................................17

CVS Caremark, https://www.caremark.com (last visited Feb. 23, 2026).........................3

CVS Health Corporation, Annual Report 2025 (Form 10-K, Exhibit 21.1, "Subsidiaries
    of CVS Health Corporation"),
    https://www.sec.gov/Archives/edgar/data/64803/000006480326000010/exhibit211-
    2025.htm (last visited Feb. 23, 2026) ...................................................................17

**INTRODUCTION**

Plaintiffs Dennis Larkin and Danielle Gosline (together, "Plaintiffs") agreed to individually arbitrate "any claims or controversies between" them and Defendant Caremark Rx, L.L.C.[1] ("Defendant"). Despite this agreement, they filed the instant putative class action against Defendant. Plaintiffs' agreement to arbitrate is valid and enforceable, and their claims against Defendant fall squarely within its scope. The Court should therefore compel Plaintiffs to arbitrate their claims against Defendant and stay this case pending the arbitration.

Caremark manages the pharmacy benefits for the employer-sponsored health plans in which Plaintiffs participate. Plaintiffs allege Caremark violated the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") when it denied their requests for coverage of Zepbound, a drug used to treat obesity and moderate-to-severe obstructive sleep apnea in adults with obesity. When Plaintiffs registered for Caremark accounts in 2024, and through their continued use of those accounts, they agreed to arbitrate "any claims or controversies between you and CVS Caremark." Plaintiffs' claims fall within the scope of the arbitration provision, as they arise out of the relationship between the parties and Caremark's provision of PBM services. Moreover, the arbitration provision affirmatively waives rights to proceed on a class basis and require Plaintiffs to pursue their claims via individual arbitration.

---

[1] The entity that contracted with Plaintiffs' respective health plans is CaremarkPCS Health, L.L.C. (*See* ECF No. 41-3 (group services agreement between CaremarkPCS Health, L.L.C. and Hillside Children's Center ("Hillside"); ECF No. 42-4 (letter of agreement between CaremarkPCS Health, L.L.C. and MMS USA Holdings, Inc., which is the holding company of Publicis Inc. ("Publicis")).) However, as explained in Defendant's Motion to Dismiss (ECF No. 41 ("Mot. to Dismiss")), Plaintiffs incorrectly sued Caremark Rx, L.L.C., wrongly alleging that Caremark Rx, L.L.C. served as the plans' pharmacy benefits manager ("PBM"). To be clear, CaremarkPCS Health, L.L.C. is the PBM for both plans. For clarity, this motion will use "Caremark" to refer to CaremarkPCS Health, L.L.C. and "Defendant" to refer to Caremark Rx, L.L.C.

The Second Circuit has repeatedly held that these kinds of web-based agreements, including the arbitration terms they contain, are valid and enforceable. *See e.g.*, *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116 (2d Cir. 2025) (holding plaintiffs formed valid agreements to arbitrate with Grubhub, Postmates, and Uber); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 709 (2d Cir. 2023) (reversing district court and holding plaintiff agreed to arbitrate with Klarna as a matter of law); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017) (reversing district court and finding plaintiff agreed to arbitrate with Uber as a matter of law). This Court may appropriately follow that settled precedent to find that those decisions compel the same result in this case.

## FACTUAL BACKGROUND

### I.   Caremark provides pharmacy benefit management services.

Caremark is a PBM that helps its health plan clients furnish prescription drug benefits to its participants. (ECF No. 1 ("Compl.") ¶¶ 1, 3.) The vast majority of health plans contract with PBMs, which provide the infrastructure, resources, and expertise necessary to navigate the enormous complexities and administrative difficulties of providing prescription drug benefits. (*Id.* ¶¶ 3-4); *see Iowa Ass'n of Bus. & Indus. v. Ommen*, No. 4:25cv211, 799 F. Supp. 3d 795, 811-12 (S.D. Iowa 2025) ("PBMs 'manage benefits on behalf of plans' and serve as agents 'who undertake and perform administrative duties for and on behalf of ERISA plans.'" (quoting *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 966-67 (8th Cir. 2021))).   PBMs like Caremark typically manage interactions between health plans, pharmacies, and beneficiaries, including processing and payment of claims, maintaining pharmacy networks, and implementing clinical programs like patient adherence and medication management. (Compl. ¶ 3.)

Caremark operates a website—Caremark.com—that individual beneficiaries of Caremark-serviced plans can use to access prescription drug benefits and information regarding those benefits. Dewell Decl. ¶¶ 6-8, 11. For example, the website allows users to: "Manage [their]

prescriptions" and "Explore [their] plan and benefits," among other options. *See* CVS Caremark, https://www.caremark.com (last visited Feb. 23, 2026). Beneficiaries can opt to "register" and create an account on Caremark.com to access these services. *Id.*; Dewell Decl. ¶¶ 6, 8; Lees Declaration ¶¶ 6-7, 17.  By signing up for a Caremark.com account, Plaintiffs are able to: (i) access their member ID cards and plan information, including a list of prior authorizations, if any; (ii) obtain a financial summary of plan benefits including cost to the member and cost to the plan of prescription drugs filled throughout the year; (iii) access the "compare medications" feature, which allows a member to obtain pricing and coverage information for any new or current prescription; and (iv) fill a prescription via a mail order pharmacy or locate any in-network retail pharmacy location for patients who prefer to fill in store. Dewell Decl. ¶ 9.

Significantly, however, signing up for an account is not a prerequisite to accessing their prescription drug benefits.  *Id.* ¶¶ 8-11.  Plan participants and beneficiaries are able to access the same services and benefits through alternative channels, including by calling the customer service telephone number on the back of their prescription benefits card, making the online account merely an option for individuals who prefer a digital, online platform. *Id.* ¶¶ 9-11.

## II.    Plaintiffs agreed to mandatory arbitration with Caremark and Defendant.

Plaintiffs Larkin and Gosline participate in health plans sponsored by their employers, Publicis and Hillside, respectively. (Compl. ¶¶ 37-38.) These employers contracted with Caremark to provide PBM services for their self-funded health plans. (Compl. ¶¶ 8, 19.) Plaintiffs elected to sign up for an account through Caremark's website, Caremark.com, to access information about those services. Lees Decl. ¶ 5; Dewell Decl. ¶¶ 6-7. In particular, Larkin created an account on September 10, 2024, and Gosline created an account on December 3, 2024. Lees Decl. ¶ 5.

To sign up for an account, Plaintiffs had to navigate to Caremark.com's website and click on the "Register" link found on the homepage. *Id.* ¶¶ 7, 17. As part of the registration process, both Plaintiffs would have been redirected to a page like or substantially similar to the one below:

*Id.* ¶¶ 9, 19. After entering the required information, Plaintiffs would not have been able to complete the registration process without clicking the "Continue" button directly beneath a link stating "Review Terms & Conditions." *Id.* ¶¶ 10, 20.

At the time Plaintiffs registered for their accounts, the Terms and Conditions stated at the top of the page:

> **THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS.**

4

Lees Decl. Ex. A at 1.[2] In a section titled "**Dispute Resolution**," the Terms and Conditions provided that "**CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED**" and that Plaintiffs were **"AGREEING TO GIVE UP THE ABILITY TO PARTICIPATE IN A CLASS ACTION."** *Id.* at 9.

The Terms and Conditions also provided that Caremark "may update this Agreement at any time, and may notify you of such updates by any reasonable means, including by posting the updated Agreement to the Site." *Id.* at 2. Plaintiffs "**AGREE[D] TO PERIODICALLY REVIEW THIS PAGE TO DETERMINE IF THIS AGREEMENT HAS BEEN UPDATED**" and were notified that their "**CONTINUED USE OF THE SERVICE FOLLOWING ANY UPDATES TO THIS AGREEMENT SHALL CONSTITUTE NOTICE AND ACCEPTANCE OF THE UPDATED AGREEMENT."** *Id.*

Since creating their accounts in 2024, Plaintiffs have continued to regularly sign into their Caremark.com accounts. *See* Lees Decl. ¶¶ 12, 22. After the initial account creation and login, Larkin signed on to use his account an additional 50 times before filing the instant Complaint on September 3, 2025. Lees Decl. ¶ 12. Gosline signed on to use her account an additional 146 times. *Id.* ¶ 22.

The Terms and Conditions were updated on July 16, 2025. *See* Lees Decl. Ex. B at 1. Larkin logged into his Caremark.com account 29 times between July 16, 2025, and September 3, 2025, when this lawsuit was filed. Lees Decl. ¶ 12. Gosline signed on 58 times during the same time period. *Id.* ¶ 22.

---

[2] Unless otherwise noted, citations to the exhibits refer to the pagination printed at the bottom of each page.

Each time Plaintiffs signed on through Caremark.com, Plaintiffs utilized the below login portal:

*Id.* ¶¶ 13, 23. After entering the required information, Plaintiffs would not have been able to complete the login process without clicking the "Continue" button directly beneath text stating "By continuing, you agree to our Terms of Use, Privacy Policy, and HIPAA Notice of Privacy Practices." *Id.* ¶¶ 14-15, 24-25. The "Terms of Use" text in that sentence is hyperlinked to the current Terms and Conditions effective July 16, 2025. *Id.* ¶¶ 14-16, 24-26.

At the top of the Terms and Conditions in the version updated on July 16, 2025, language appears in bold, capital letters, notifying the user that the Terms and Conditions contain a mandatory arbitration provision:

**THIS AGREEMENT INCLUDES AN ARBITRATION PROVISION, JURY TRIAL WAIVER, AND A CLASS ACTION WAIVER THAT AFFECT YOUR RIGHTS. IN ARBITRATION, THERE IS NO JUDGE OR JURY, AND THERE IS LESS DISCOVERY AND APPELLATE REVIEW THAN IN COURT. DETAILS ARE SET FORTH BELOW. PLEASE REVIEW CAREFULLY.**

Lees Decl. Ex. B at 1. In a section titled "**Dispute Resolution**," the Terms and Conditions include an arbitration provision that states:

> **YOU AND CVS CAREMARK AGREE THAT ANY DISPUTE (DEFINED BELOW) SHALL BE RESOLVED BY FINAL AND BINDING INDIVIDUAL ARBITRATION EXCEPT AS OTHERWISE PROVIDED HEREIN . . . .**

*Id.* at 13. In relevant part, the Terms and Conditions define "Dispute" to include:

> any claims or controversies between you and CVS Caremark that are related in any way to this Agreement, including, but not limited to, your use of the Services, sales, returns, refunds, cancellations, defects, policies, privacy, advertising, and/or any communications between you and CVS Caremark, whether occurring on the Services, in-store, or otherwise . . . . includ[ing] . . . claims that: (a) you bring against CVS Caremark; . . . (c) in any way relate to or arise out of any aspect of the relationship between you and CVS Caremark, whether based in contract, tort, statute, fraud, misrepresentation, advertising claims, or any other legal theory; (d) arose before you entered into this Agreement or out of a prior agreement with CVS Caremark (including, without limitation, claims relating to advertising) . . . .

*Id.* at 14. For purposes of the "**Dispute Resolution**" section, "CVS Caremark" is defined as "CaremarkPCS Health, L.L.C., its subsidiaries or affiliates, as well as any of their respective present or future affiliates or subsidiaries, and any persons or entities (including agents, representatives, or employees) related to CVS Caremark or its present or future affiliates or subsidiaries." *Id.* at 13.

> The subsection titled "**Waiver of Jury Trial; Waiver of Class Actions**" states:
>
> TO THE FULLEST EXTENT PERMISSIBLE BY APPLICABLE LAW, YOU AND CVS CAREMARK WAIVE THE RIGHT TO A JURY TRIAL. YOU AND CVS CAREMARK ALSO WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS ACTION IN ARBITRATION OR IN LITIGATION IN COURT.

*Id.* at 19.

### III.    <u>**Plaintiffs brought putative class action claims against Defendant in federal court.**</u>

Despite their agreement to arbitrate their disputes, on September 3, 2025, Plaintiffs filed this putative class action lawsuit. (*See* Compl.) Plaintiffs claim that they requested coverage under their employer-sponsored health benefit plans for Zepbound—a drug used for the treatment of obesity and weight management—and that Defendant denied their requests. (*Id.* ¶¶ 1, 9-11, 20.) Plaintiffs assert claims under ERISA for alleged breaches of fiduciary duty, prohibited transactions, and violation of plan terms. (*Id.* ¶¶ 1, 161-181.) Plaintiffs seek injunctive and other equitable relief. (*Id.*)

### <u>PROCEDURAL BACKGROUND</u>

On November 17, 2025, Defendant filed its motion to dismiss Plaintiffs' Complaint and, on the same day, filed a pre-motion letter brief requesting this Court's permission to move to compel arbitration. (ECF Nos. 37 ("Caremark's Arbitration Letter Brief"), 38 ("Mot. to Dismiss").)

Plaintiffs responded and opposed Defendant's request.  (ECF No. 44 ("Plaintiffs' Letter Brief in Opp.").) In their letter opposition, Plaintiffs asserted, among other things, (1) that their ERISA claims were governed by plan documents providing for adjudication in federal court; (2) that no valid arbitration agreement exists because the named defendant, Caremark Rx, L.L.C., is "not even a party to the" agreement; (3) that Plaintiffs were "require[ed]" to create a Caremark.com account to receive prescriptions, and specifically to access certain 90-day or mail-order prescriptions, rendering the arbitration agreement an "unconscionable contract of adhesion"[3]; and (4) that the arbitration provision is unenforceable under the "effective-vindication

---

[3]     The factual basis for Plaintiffs' suggestion that the arbitration agreement is an "unconscionable contract of adhesion," is unclear.  (*See* Plaintiffs' Letter Brief in Opp. at 3.) To

exception" because the arbitration provision would require ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), claims seeking plan-wide relief to be resolved through individual arbitration, thereby eliminating Plaintiffs' statutory rights. (*Id.* at 1-3.)

On January 22, 2026, the Court held a pre-motion conference on Defendant's request to move to compel arbitration during which it granted Defendant's request to file the instant motion to compel Plaintiffs to arbitrate the claims raised in their Complaint. (ECF No. 52.) In that pre-motion conference, Plaintiffs' counsel represented, inconsistently with their prior pleadings, that the "relief [Plaintiffs] seek is on their own behalf and injunctive relief on behalf of themselves and their *plans* under 502(a)(2)."[4] (*Compare* ECF No. 53 ("Transcript of Pre-Motion Conference") at 7, *with* Compl.) Furthermore, at the pre-motion conference Plaintiffs' counsel pressed for discovery, despite the unresolved arbitration issue. (*See* Transcript of Pre-Motion Conference at 8, 14-15.)

## LEGAL STANDARD

Arbitration agreements within the scope of the Federal Arbitration Act ("FAA") "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA was enacted by Congress to overcome "widespread judicial hostility to arbitration agreements," and to ensure that courts enforce valid agreements to arbitrate. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 344 (2011) ("The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings."); *KPMG LLP v. Cocchi*, 565

---

the extent Plaintiffs intend to argue that they had no choice but to accept the agreement in order to receive their prescription drug benefits, that argument is incorrect. *See* Dewell Decl. ¶¶ 8-11 ("[P]articipation in the Caremark.com platform is completely voluntary.").

[4]     As explained below, *infra* Section III, Plaintiffs have not brought claim under ERISA § 502(a)(2). In fact, their Complaint does not even reference ERISA § 502(a)(2). And while the Complaint includes a lone citation to 29 U.S.C. § 1109, the Complaint repeatedly confirms that Plaintiffs are not seeking relief on behalf of their plans. *See infra* Section III.

U.S. 18, 21–22 (2011); *see also* 9 U.S.C. § 4 (authorizing district courts to hear petitions to enforce arbitration agreements).

"By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Accordingly, a district court's involvement is limited to determining whether a valid arbitration agreement exists and whether the agreement encompasses the dispute at issue. *See id.*; 9 U.S.C. § 4 ("The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.").

As this Court has held: "[a]ny doubts as to the construction of the [Federal Arbitration] Act ought to be resolved in line with its liberal policy of promoting arbitration." *See, e.g.*, *Avant Petroleum, Inc. v. Pecten Arabian, Ltd.*, 696 F. Supp. 42, 45 (S.D.N.Y. 1988) (Stanton, J.) (citations omitted). Indeed, this policy has been "consistently reiterated by the federal courts" and "deserves to be heartily endorsed." *Id.; see also In re NAP, Inc.*, No. 96 Civ. 640, 1996 U.S. Dist. LEXIS 5857, at *8-9, *14 (S.D.N.Y. Apr. 30, 1996) (Stanton, J.) (ruling that even an informal letter sufficiently reflected the parties' agreement to arbitrate their disputes), *aff'd*, No. 96-7677, 1996 U.S. App. LEXIS 20835 (2d Cir. Aug. 16, 1996); *Durso Supermarkets v. D'Urso (In re Durso Supermarkets)*, 170 B.R. 211, 215 (S.D.N.Y. 1994) (Stanton, J.) (granting motion to compel arbitration where the agreement could be "interpreted as an expression of intent to arbitrate any disputes regarding" the financial statements); *Canouse v. Protext Mobility, Inc.*, No. 18 Civ. 3610,

10

2019 U.S. Dist. LEXIS 20195, at *1, *6 (S.D.N.Y. Jan. 30, 2019) (Stanton, J.) (granting defendant's motion to compel arbitration).

**ARGUMENT**

Plaintiffs agreed to the Caremark.com Terms and Conditions which contain a valid and enforceable arbitration agreement. The instant dispute falls squarely within the scope of Plaintiffs' agreement. Accordingly, Plaintiffs should be compelled to arbitrate on an individual basis while this case is stayed pending the outcome of the arbitration.

**I.      Plaintiffs voluntarily agreed to arbitrate their claims against Defendant.**

In determining whether a valid agreement to arbitrate exists, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, the Caremark.com Terms and Conditions provide that New York law governs. Lees Decl. Ex. B at 12.

"Under New York law, 'mutual assent is essential to the formation of a contract'" and "may be by word, act, or conduct which evinces the intention of the parties to contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (emphasis omitted) (quoting *Maffea v. Ippolito*, 247 A.D.2d 366, 367 (2d Dep't 1998)). "These principles are the 'touchstone of contract formation, . . . and they apply with equal force to contracts formed online." *Edmundson*, 85 F.4th at 703 (citations omitted).[5] The Second Circuit has recognized that "an offeree's manifestation of assent to an offeror's terms looks different for consumer contracts formed online, in which terms are usually unnegotiated and consumers often proceed without reading the fine print." *Id.* In these

---

[5]      Although *Edmundson* involved Connecticut law, the Second Circuit has recognized that "[t]raditional contract formation law does not vary meaningfully from state to state, and therefore, our precedents determining the enforceability of arbitration provisions according to the contract-law principles of other states may also be relevant to this dispute." 85 F.4th at 702-03 (citations omitted) (relying on precedent interpreting California and New York contract law and noting they are "substantially similar").

circumstances, "when 'an offeree does not have *actual* notice of certain contract terms,'" New York law provides that the offeree "is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Davitashvili*, 131 F.4th at 115-16 & n.20 (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)).

Inquiry notice requires showing that "the contract terms were presented to the offeree in a clear and conspicuous way[,]" *Davitashvili*, 131 F.4th at 116, such that "[r]easonable internet users would understand that" continuing with their use of the services, registration, or purchase "constitutes their confirmation that they 'agree to the . . . terms[,]'" *Edmundson*, 85 F.4th at 708 (emphasis omitted). Looking to the design and content of the website interface, courts consider factors such as "whether the terms of use are 'spatially coupled' with the checkout button, whether the entire screen is visible at once without scrolling, whether the checkout button is 'temporally coupled' with the hyperlink to the terms of use, and whether the language is clear." *Davitashvili*, 131 F.4th at 116.

All of these criteria are met here. As recently as last summer, Plaintiffs received inquiry notice of the hyperlinked Caremark.com Terms and Conditions, including the arbitration provisions therein. Lees Decl. ¶¶ 12, 14-15, 22, 24-25. Caremark.com's login screen is readily visible without scrolling, uncluttered, and the "Continue" button is both spatially and temporally coupled with the hyperlink to the terms of use, signaling that the consumer should associate the creation of a Caremark.com account with the terms of use. *Id.* ¶¶ 15, 25; *see Davitashvili*, 131 F.4th at 116. Finally, the language, "By continuing, you agree to our Terms of Use, Privacy Policy, and HIPAA Notice of Privacy Practices," Lees Decl. ¶¶ 15, 25, is nearly identical to what the Second Circuit approved in *Meyer* and described as providing "a clear prompt directing users to read the

Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms." 868 F.3d at 78-79 (holding language stating "by creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" located beneath the "register" button was sufficient to "render the notice provided reasonable"); *accord Davitashvili*, 131 F.4th at 116-17 (holding GrubHub's mobile app and web interface provided inquiry notice).

By clicking "Continue" each time they logged in through the website interface after July 16, 2025, Plaintiffs unambiguously manifested their assent to the current Terms and Conditions and are bound by them. *See, e.g.*, *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394 (9th Cir. 2020) ("Lee validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he clicked the 'Sign In' button when signing into his Ticketmaster account, where three lines below the button, the website displayed the phrase, 'By continuing past this page, you agree to our Terms of Use,' . . . ." (citation omitted)); *Kelly-Starkebaum v. Papaya Gaming Ltd.*, No. 24cv2310, 2024 U.S. Dist. LEXIS 229875, at *17 (S.D.N.Y. Dec. 17, 2024) ("For much the same reasons that a reasonably prudent user was on notice of Papaya's terms of use, the record reflects that the plaintiff unambiguously assented to them. There is no dispute that the plaintiff proceeded through the deposit screen numerous times over the two years that she used Papaya's applications."); *Himber v. Live Nation Worldwide, Inc.*, No. 16-CV-5001, 2018 U.S. Dist. LEXIS 84945, at *13 (E.D.N.Y. May 21, 2018) ("When Himber used the website on the day he purchased the Rascal Flatts tickets, he again manifested assent to be bound by the Terms of Use . . . ." (citation omitted)); *see also Register.com, Inc.*, 356 F.3d at 401 (finding assent to contract terms in part because consumer's use of service was not "sporadic and infrequent," but daily, and consumer received notice of terms with each use).

13

Courts routinely enforce web-based contracts, such as the ones Plaintiffs agreed to, where consumers had "inquiry notice," rejecting any arguments based on an individual's failure to read the terms. *See, e.g.*, *Meyer*, 868 F.3d at 79 ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 832 (S.D.N.Y. 2020) ("By signing up for Postmates' service, Feld manifested assent to the TOS, even if she did not click on the hyperlink to read the contract."); *Coe v. Coca-Cola Co.*, 702 F. Supp. 3d 140, 158 (W.D.N.Y. 2023) ("[I]t is clear from the nature of Coke's programs that there was no immediacy or time-is-of-the-essence required for participation. Coe thus had ample opportunity to read and study the provisions, to educate himself on the meaning of 'arbitration,' and to consult a lawyer.").

Furthermore, contrary to Plaintiffs' suggestion (Plaintiffs' Letter Brief in Opp. at 3), Plaintiffs were not required to create a Caremark.com account to access prescription drug benefits under their health plans. ***Creating a Caremark.com account is entirely optional***. *See* Dewell Decl. ¶¶ 8-11. Participants can access the full range of their pharmacy benefits—including obtaining medically-necessary drugs, using Caremark's mail-order pharmacy service, and filling 90-day prescriptions—through alternative channels, including by calling the customer service telephone number printed on the back of their prescription benefits card. *See id.* Accordingly, because access to benefits does not depend on assent to the online Terms and Conditions, Plaintiffs were not "force[d]" to "choose between their ERISA rights and their health." (Plaintiffs' Letter Brief in Opp. at 3.)

For these reasons, Plaintiffs entered into valid and enforceable arbitration agreements with Caremark and Defendant.

14

## II.    <u>The arbitration agreement covers this dispute.</u>

The arbitration agreement applies to "ANY DISPUTE," including "any claims or controversies between you and CVS Caremark." Lees Decl. Ex. B at 13-14. Plainly, all of Plaintiffs' claims fall squarely within the arbitration provision's broad scope.

### A.    **The broad scope of the arbitration agreement is enforceable.**

Whether the parties consented to arbitrate a particular dispute is subject to "[o]rdinary principles of contract law." *Local Union 97, IBEW v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)). "Under New York law, the 'primary objective' in interpreting a contract 'is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Patrick v. Focus Fin. Partners, LLC*, No. 25cv5053, 2025 U.S. Dist. LEXIS 162001, at *6-7 (S.D.N.Y. Aug. 19, 2025) (quoting *In re Motors Liquidation Co.*, 943 F.3d 125, 131 (2d Cir. 2019)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at *7.

The New York Court of Appeals has expressly recognized that "broad arbitration agreements are permissible." *Meisels v. Uhr*, 79 N.Y.2d 526, 538 (1992) (holding arbitration agreement applicable to "all the disputes between them and as well on [the] three buildings" was valid). Such clauses "must be given full effect in order to effectuate the intent of the parties." *Gupta v. Merrill Lynch*, No. 12-1787, 2014 U.S. Dist. LEXIS 113670, at *21 (E.D. La. Aug. 15, 2014) (applying New York law). "Any limitation on the scope of a broad arbitration clause must be specifically enumerated in the agreement itself." *Id.*

"[I]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, [courts] focus on the factual allegations in the complaint rather than the legal causes of action asserted." *New York v. Oneida Indian Nation*, 90 F.3d 58, 60-61 (2d Cir. 1996). If "the

15

agreement is 'ambiguous about whether it covers the dispute at hand,' the court may apply a 'presumption of arbitrability.'" *Local Union 97 Int'l Bhd. of Elec. Workers, AFL-CIO*, 67 F.4th at 113 (quoting *Granite Rock Co.*, 561 U.S. at 301).

In this matter, the broad nature of the arbitration provision in the Caremark.com Terms and Conditions is entitled to be "given full effect." *See Gupta*, 2014 U.S. Dist. LEXIS 113670, at *21. By its clear and plain language, the provision applies "any claims or controversies between you and CVS Caremark." Lees Decl. Ex. B at 14. The provision specifies that this includes claims related to "your use of the Services, . . . and/or any communications between you and CVS Caremark," as well as "claims that . . . you bring against CVS Caremark" and that "in any way relate to or arise out of any aspect of the relationship between you and CVS Caremark, whether based in contract, tort, statute, . . . or *any other legal theory*." *Id.* (emphasis added).

### B.       Plaintiffs' claims fall within the scope of the broad arbitration agreement.

#### 1.       The arbitration agreement covers disputes with Defendant.

In their letter opposition, Plaintiffs emphasized the fact that Defendant (i.e., Caremark Rx, L.L.C., the named defendant in the case) is not a party to the arbitration agreement.  (Plaintiffs' Letter Brief in Opp. at 3.) That fact has no bearing on whether the arbitration agreement encompasses the present dispute. The arbitration agreement covers "any claims or controversies between" Plaintiffs and "CVS Caremark," which is defined as "CaremarkPCS Health, L.L.C., its subsidiaries or affiliates, as well as any of their respective present or future affiliates or subsidiaries, and any persons or entities (including agents, representatives, or employees) related to CVS Caremark or its present or future affiliates or subsidiaries." Lees Decl. Ex. B at 13. As the parent company of CaremarkPCS Health, L.L.C., Caremark Rx., L.L.C. is an "affiliate" of

16

CaremarkPCS Health, L.L.C.[6] *See Affiliate*, Black's Law Dictionary (12th ed. 2024) ("A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."). Thus, the arbitration agreement covers "any claims or controversies between" Plaintiffs and Defendant, Caremark Rx, L.L.C.

> **2.    The arbitration agreement encompasses the dispute alleged in the Complaint.**

The arbitration provision also encompasses the dispute Plaintiffs allege in their complaint. The provision's scope reaches any claims Plaintiffs "bring against CVS Caremark"—regardless of the nature of those claims, the factual allegations underlying them, or the legal theory pled. *See Gupta*, 2014 U.S. Dist. LEXIS 113670, at *20-21 (plaintiff's claims relating to trust mismanagement fell within the broad scope of an Option Agreement's arbitration provision that applied to "any controversy with MLPFS, whether that controversy arises from the Option Agreement itself or any other agreement or transaction with MLPFS"); *Jabbour v. Brillio, LLC*, No. 24-cv-2704, 2025 U.S. Dist. LEXIS 47330, at *13 (S.D.N.Y. Mar. 14, 2025) (citation omitted) (holding plaintiff's state common law claims were within arbitration provision's scope covering "disputes arising out of or related to the employment relationship, compensation . . . and all other state statutory and common law claims").

---

[6]    CVS Health Corporation, Annual Report 2025 (Form 10-K, Exhibit 21.1, "Subsidiaries of CVS Health Corporation"), https://www.sec.gov/Archives/edgar/data/64803/000006480326000010/exhibit211-2025.htm (last visited Feb. 23, 2026). The Court can take judicial notice of Defendant's status as a parent company of CaremarkPCS Health, L.L.C. from this filing with the U.S. Securities and Exchange Commission's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system. *See Staehr v. Hartford Fin. Serv's Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008) ("[M]atters judicially noticed by the District Court are not considered matters outside the pleadings."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (the court may "take judicial notice of the contents of relevant public disclosure documents . . . as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" (quotation marks omitted)).

Moreover, Plaintiffs' factual allegations demonstrate that their claims arise from "Services"[7]—prescription drug benefits, including information regarding those benefits—provided by Caremark, communications with Caremark about their prescription drug benefits and coverage, and the relationship established between Plaintiffs and Caremark based on Caremark's provision of PBM services and management of Plaintiffs' prescription benefits.

Plaintiffs' claims arise directly from Caremark's provision of PBM services, including coverage determinations, appeals administration, and related communications with plan members. After Caremark became the PBM for Larkin's employer-sponsored plan and began managing Larkin's prescription benefits effective January 1, 2025, Caremark allegedly approved his physician's request for coverage for Zepbound, processed his prescription refills, and later denied coverage based on formulary criteria. (*See* Compl. ¶¶ 12-13.) Larkin allegedly pursued the appeals process administered by Caremark, resulting in denials and a final external review upholding Caremark's determination. (*See id.* ¶¶ 14-17.)

The same is true for Gosline. After her employer transitioned to using Caremark as its PBM, Caremark administered her prescription benefits, honored her existing prior authorization, and later denied coverage for Zepbound based on formulary criteria. (*See id.* ¶¶ 21, 23.) Gosline allegedly appealed that denial through Caremark's appeals process, after which Caremark reviewed and denied the appeal. (*See id.* ¶¶ 24-25.) Additionally, Plaintiffs created and used their Caremark.com accounts regularly to access and obtain information and services from Caremark in connection with their prescription drug benefits and coverage.  Lees Decl. ¶¶ 12, 22.

---

[7]     "Services" is defined as use of "www.caremark.com (the 'Site'), CVS/Caremark mobile app (the 'Caremark App'), other sites where this Agreement is posted, or any services, content, information, or goods provided through or in connection with the Site, the Caremark App, or by or on behalf of CaremarkPCS Health L.L.C. or one of its subsidiaries or affiliates." Lees Decl. Ex. B at 1.

18

Collectively, Plaintiffs' allegations demonstrate that Plaintiffs' claims arise from their individualized contacts with Caremark, including through their Caremark.com account. Accordingly, Plaintiffs' claims fall comfortably within the broad scope of the arbitration provision in the Caremark Terms and Conditions. *See, e.g.*, *Merrick v. UnitedHealth Grp. Inc.*, 127 F. Supp. 3d 138, 150-51 (S.D.N.Y. 2015) (in-network provider's ERISA claims against insurer fell within scope of arbitration agreement covering "any dispute arising out of or relating to [the] agreement" and "any disputes about their business relationship."); *Himber*, 2018 U.S. Dist. LEXIS 84945, at *16-17 (holding arbitration clause covering "[a]ny dispute or claim relating in any way to your use of the Site, or to products or services sold or distributed by us or through us" applied to plaintiff's "claims for false advertising and deceptive practices" arising from his use of Live Nation's website "in connection with his box-office purchase of tickets—Live Nation's 'products or services'"); *Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 224 (S.D.N.Y. 2024) (dispute regarding purchase of vehicle at end of leasing contract was within scope of arbitration provision that applied to "contract, tort, and statutory claims against Nissan" (alterations adopted)).

### III.    The effective-vindication doctrine does not apply to Plaintiffs' claims.

Plaintiffs have asserted that the "effective-vindication" doctrine applies as an exception to the FAA's mandate that the Court enforce the parties' arbitration agreement. (Plaintiffs' Letter Brief in Opp. at 1-3.) Specifically, Plaintiffs suggest that the arbitration provision impermissibly "extinguish[es] statutory ERISA rights" because "[ERISA §] 502(a)(2) claims cannot be effectively vindicated through arbitration." (*Id.* at 3.) Plaintiffs rely on a string of cases to suggest that the arbitration provision they agreed to is unenforceable under this doctrine. (*See id.* at 1-2 (citing *Cedeno v. Sasson*, 100 F.4th 386 (2d Cir. 2024); *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173 (2d Cir. 2021); *Platt v. Sodexo, S.A.*, 148 F.4th 709 (9th Cir. 2025)).) None of those

19

cases support Plaintiffs' position. Rather, they illustrate precisely why the effective vindication doctrine does not apply here.

Contrary to Plaintiffs' suggestion, the arbitration provision to which Plaintiffs agreed does not "extinguish" any "ERISA rights" under ERISA § 502(a)(2) that Plaintiffs are pursuing through this lawsuit. Section 502(a)(2) of ERISA provides that a plan participant may bring an action "for appropriate relief" under ERISA § 409. 29 U.S.C. §§ 1132(a)(2), 1109(a). Section 409(a), in turn, provides that a fiduciary who breaches statutory duties:

> [S]hall be personally liable to make good to such *plan* any losses to the *plan* resulting from each such breach, and to restore to such *plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a) (emphases added). The Supreme Court has explained that ERISA § 409(a) "provid[es] relief singularly to the *plan*" and seeks to "protect the *entire plan*" rather than "the rights of an individual beneficiary." *Mass. Mut. Life Ins. v. Russell*, 473 U.S. 134, 142 (1985) (emphases added). For this reason, a plaintiff asserting a claim under ERISA § 502(a)(2) must seek plan-wide relief in a representative capacity "on behalf of the plan." *Id.* at 142 & n.9.

Here, Plaintiffs do not purport to seek any relief on behalf of their plans. Instead, Plaintiffs make clear that they seek relief on behalf of themselves individually and members of the "class" they seek to represent:

> (1) a breach of fiduciary duty claim "*individually* and on behalf of the *Class*" under "**§§ 1132(a)(1)(B) and (a)(3)**";
>
> (2) a prohibited transaction claim "*individually* and on behalf of the *Class*" under "**§ 1108**";
>
> (3) a claim for benefits based on the violation of Plan terms "*individually* and on behalf of the *Class*" under "**§ 1132(a)(1)(B)**";

20

(4) a claim for injunctive relief "*individually* and on behalf of the *Class*" under "**§ 1132(a)(3)(A)**" to the extent that injunctive relief is available under "**§ 1132(a)(1)(B)**"; and

(5) a claim for equitable relief "on behalf of *themselves* and the *Class*" under "**§ 1132(a)(3)(B)**" to the extent that equitable relief is available under "**§ 1132(a)(1)(B)**."

(Compl. ¶¶ 1, 161, 169, 176, 183, 187 (emphases added).)  Notably, too, Plaintiffs' opposition to Defendant's Motion to Dismiss does not even mention ERISA § 502(a)(2)—instead, they specifically assert that they have brought "this action on behalf of *themselves* and a nationwide *class*." (*See generally* ECF No. 48 ("Opp. to Mot. to Dismiss").) Thus, both the Complaint and the Plaintiffs' opposition brief confirm that Plaintiffs never intended to bring a claim on behalf of the plans or seek plan-wide relief (*See generally id.*; Compl.)

The putative "class" that Plaintiffs seek to represent is not Plaintiffs' respective plans. Rather, the "class" comprises only a small fraction, if any, of the members of Plaintiffs' plans and an unknown number of members of other unspecified plans. Specifically, Plaintiffs allege the "class" includes "member[s]" of unspecified "health benefit plan[s] for whom [Caremark] acts as a [PBM]" and who were denied coverage for Zepbound.  (Compl. ¶ 151.)  In short, Plaintiffs do not seek relief "on behalf of" either of their plans.

Nor do Plaintiffs seek any of the relief set forth in ERISA § 409(a), 29 U.S.C. § 1109(a). Plaintiffs do not seek to recover "any losses to the *plan*" and do not seek to "restore to such *plan* any profits" made by a fiduciary. 29 U.S.C. § 1109(a) (emphasis added). Instead, Plaintiffs expressly seek a declaration "that Zepbound is medically necessary" in certain circumstances, a "reprocess[ing] of claims for coverage of Zepbound that [were] previously denied," and "other appropriate equitable relief."  (Compl. at 35-36.)  None of this requested relief is afforded to

21

Plaintiffs under § 409(a) of ERISA.[8] In sum, by their own allegations, Plaintiffs do not seek any of the plan-wide relief that ERISA authorizes under § 502(a)(2). Because Plaintiffs do not seek relief under ERISA § 502(a)(2), the arbitration agreement cannot possibly operate as waiver of the rights Plaintiffs seek to vindicate under ERISA § 502(a)(2).

Plaintiffs' requested relief in this case stands in stark contrast to the relief requested in the cases they rely on where courts have determined that the effective vindication doctrine applies. In the ERISA context, the effective vindication doctrine applies only where—unlike here—the plaintiff seeks plan-wide relief under ERISA § 502(a)(2) in a representative capacity on behalf of the plan. For example, in *Cedeno*, the plaintiff, a participant in his employer's stock ownership plan, alleged that plan fiduciaries breached their fiduciary duties by causing the plan to overpay for employer stock thereby causing plan-wide losses. 100 F.4th at 389-90. The plaintiff sued under ERISA § 502(a)(2) in a representative capacity on behalf of the plan to restore losses to the plan. *Id.* at 390. Because the applicable arbitration agreement limited relief to a participant's individual account and barred plan-wide remedies, the Second Circuit ruled that the arbitration agreement impermissibly prospectively waived the plaintiff's ability to obtain the *plan-wide* relief that was sought under ERISA § 502(a)(2). *Id.*

As in *Cedeno*, the Second Circuit's decision in *Cooper* likewise involved an ERISA § 502(a)(2) claim in which the plaintiff sought relief on behalf of its plan to restore losses to the plan. *See Cooper*, 990 F.3d at 175. The plaintiff in *Cooper* brought a representative action under ERISA § 502(a)(2) on behalf of a profit-sharing plan, alleging that the plan's investment manager

---

[8]    Notably, Plaintiffs' 189-paragraph Complaint contains only a single passing reference to ERISA § 409. (Compl. ¶ 175.) This ERISA § 409 cite appears in the final paragraph of Count II, but Count II alleges a "Prohibited Transaction in Violation of ERISA Section 406 (On behalf of *Plaintiffs* and the *Class* against Defendant.)," not Plaintiffs' plans. (*Id.* at 32 (emphases added).)

breached fiduciary duties causing significant plan-wide losses. 990 F.3d at 176-77. The plaintiff sought relief on behalf of the plan to restore the losses caused by the fiduciary. Because the arbitration agreement mandated that all arbitrated claims "be asserted, heard and resolved on a single Associate basis," the provision precluded the relief the plaintiff sought under ERISA § 502(a)(2). *Id.* at 184–85.

The non-Second Circuit precedent that Plaintiffs rely on involves similar ERISA § 502(a)(2) claims that the plaintiff brought on behalf of their plans seeking to restore losses directly to the plan. *See Platt*, 148 F.4th at 721; *Williams v. Shapiro*, 161 F.4th 1313, 1315-17 (11th Cir. 2025). Collectively, all of Plaintiffs' cited authorities confirm that, in the ERISA context, the effective vindication doctrine applies only where the plaintiff has asserted a claim under ERISA § 502(a)(2) for plan-wide relief. Here, Plaintiffs have not done so, and the effective vindication doctrine does not apply.

## IV. This Court should compel arbitration and stay the case without deciding the motion to dismiss.

The FAA provides that in any suit "upon any issue referable to arbitration," the court "*shall* . . . stay the trial of the action until arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added); *see Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (holding that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). This language "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.*, 470 U.S. at 218. Because this lawsuit is subject to mandatory arbitration, this Court should compel arbitration and stay proceedings pending a final arbitral award.

Furthermore, the Court may—and should—decide Defendant's motion to compel arbitration before addressing Defendant's pending motion to dismiss, including based on lack of personal jurisdiction. However, when a court is presented with multiple "threshold grounds for denying audience to a case," the court has "leeway" to choose among them. *Desarrolladora La Ribera v. Anderson*, No. 24-CV-67, 2024 U.S. Dist. LEXIS 231048, at *32 n.13 (S.D.N.Y. Dec. 20, 2024) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)). Accordingly, a district court can, and should, grant a motion to compel arbitration before deciding a motion to dismiss, even one that raises jurisdictional arguments. *See id.*; *see also Burch v. 1412 Lansdowne Operating, LLC*, No. 18-CV-3000, 2020 WL 1243805, at *7 (E.D.N.Y. Sep. 29, 2021) ("A court may resolve a motion to compel arbitration before addressing a motion to dismiss based on lack of personal jurisdiction"); *Lewis v. ANSYS, Inc.*, No. 19-CV-10427, 2021 U.S. Dist. LEXIS 60898, at *7 (S.D.N.Y. Mar. 30, 2021) (citation omitted) (recognizing that "[c]ourts in [the Southern District of New York] will resolve a motion to compel arbitration prior to resolving a motion to dismiss for lack of personal jurisdiction"); *Trs. of Laundry, Dry Cleaning Workers & Allied Indus. Health Fund, Workers United v. FDR Servs. Corp. of N.Y.*, No. 17 CV 7145 (VB), 2019 U.S. Dist. LEXIS 146869, at *3 n.1 (S.D.N.Y. Aug. 28, 2019) (resolving a motion to compel arbitration before a motion to dismiss for lack of subject matter jurisdiction). Accordingly, the Court should grant this motion to compel arbitration and stay the case pending the outcome of arbitration, without ruling on the merits of the motion to dismiss. *See id.*

## V.   <u>Discovery should be stayed pending a ruling on this motion.</u>

"[U]pon a showing of good cause a district court has considerable discretion to stay discovery pursuant to Fed. R. Civ. P. 26(c)." *Ahmad v. Day*, No. 20 Civ. 4507, 2021 U.S. Dist. LEXIS 32401, at *1-2 (S.D.N.Y. Feb. 22, 2021). Ordinarily, courts in the Second Circuit consider a three-factor test when assessing a motion to stay discovery pending a dispositive motion –

24

"(1) the breadth of discovery sought, (2) any prejudice that would result, and (3) the strength of the motion." *Id.* However, due to forum concerns, "courts in this Circuit have stayed discovery pending the resolution of a motion to compel arbitration without even investigating the three-part test[]." *Smith v. Experian Info. Sols., Inc.*, No. 1:22-cv-06960-VSB, 2023 U.S. Dist. LEXIS 112052, at *3 (S.D.N.Y. June 6, 2023) (collecting cases).  Indeed, "[i]t is 'the general practice of district courts' to issue 'a stay of discovery … while the motion to compel arbitration was pending before the Court.'" *Id.* at *2.

Here, good cause exists to stay discovery pending the resolution of the motion to compel arbitration because a stay would prevent prejudice to Defendant, who would otherwise be forced to spend time and resources on costly discovery, defeating one of the key purposes of arbitration. *See, e.g.*, *Smith*, 2023 U.S. Dist. LEXIS 112052, at *5-6 (without a stay of discovery the defendant would "be forced to engage in costly and burdensome discovery related to [the plaintiff's] claims in this forum, in contravention of the parties' written agreement," and would "forever lose the advantages of arbitration—speed and economy."); *Marsh v. Williams*, No. 22 Civ. 8920, 2023 U.S. Dist. LEXIS 34161, at *5 (S.D.N.Y. Feb. 27, 2023) ("[A] stay of discovery pending the decision on a threshold arbitration issue . . . serves to help prevent duplicative and inefficient litigation." (internal quotation marks omitted)). Notably, the arbitration forum agreed to by the parties, National Arbitration and Mediation, proscribes its own discovery rules that differ from the scope of discovery under Federal Rule of Civil Procedure.[9]

## CONCLUSION

For these reasons, the Court should enforce the parties' arbitration agreements, compel Plaintiffs to individually arbitrate their claims and stay these proceedings in the meantime.

---

[9]    "Comprehensive Dispute Resolution Rules and Procedures," National Arbitration and Mediation, Updates as of Dec. 16, 2025, Rule No. 18. Discovery Procedure.

Dated: February 23, 2026

Respectfully submitted,

 /s/ Steven Penaro

**ALSTON & BIRD LLP**
Steven Penaro
Bar No. 4765046
90 Park Ave.
New York, NY 10016
Tel: (212) 210-9460
steve.penaro@alston.com

Kelsey Kingsbery (*pro hac vice*)
555 Fayetteville Street, Suite 600
 Raleigh, NC  27601
 Tel: (919) 862-2227
 kelsey.kingsbery@alston.com

Emily S. Costin (*pro hac vice*)
 The Atlantic Building
 950 F. Street, NW
 Washington, DC 20004-1404
 Tel: (202) 239-3300
 Fax: (202) 239-3333
 emily.costin@alston.com

*Attorneys for Defendant*
 CAREMARK RX, L.L.C. (d/b/a
 CVS CAREMARK)

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Local Rule 7.1(c), that the foregoing memorandum, which was prepared using Times New Roman 12-point proportional font, contains 7,642 words.

*/s/ Steven Penaro*
**ALSTON & BIRD LLP**
Steven Penaro
Bar No. 4765046
90 Park Ave.
New York, NY 10016
Tel: (212) 210-9460
steve.penaro@alston.com
